No. 2245.
## Second Circuit Appeal.

## JOSEPH LACHENAYE v. ROBERT P. BERGERON

(June 13, 1925, Opinion and Decree.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Sales—Par. 219.**
Where the defects complained of were discovered before the sale, the sale cannot be set aside.
(Civil Code, Article 2521. Editor's note.)

Appeal from Fourteenth Judicial District Court of Louisiana, Parish of Avoyelles, Hon. S. Allen Bordelon, Judge.

This is a suit to set aside a sale of two horses for fraud and recovery of promissory notes given in payment.

There was judgment for plaintiff and defendant appealed.

Judgment reversed.

G. H. Couvillon, of Marksville, attorney for plaintiff, appellee.

N. I. Normand, of Marksville, attorney for defendant, appellant.

REYNOLDS, J. This is a suit to annul, revoke and set aside the sale of two horses made by Robert P. Bergeron to Joseph Lachenaye for $125.00 and to have cancelled and returned to plaintiff two pormissory notes, one for $125.00 given by him to represent the purchase price of the two animals and the other for $9.00 given to represent interest on the debt, and to recover $2.50 expenses connected with the sale paid by plaintiff; on the grounds that when the horses were sold, one had a blind eye which was observed and discussed but defendant guaranteed that the other eye was in perfect condition, well knowing that the horse was fast losing his sight and would soon be blind, and thereafter the eye "was almost completely lost, so much so that he could hardly con-

duct himself, and was not fit for service". Plaintiff alleges·that defendant was in bad faith when he sold him the horses and imposed on him by making false representations. He alleges that he tendered the defendant his horses back and demanded the return of his promissory notes but that defendant refused to take back his horses or return plaintiff his promissory notes.

He prays that the sale be annulled and his notes be returned to him with $2.50 expenses of the sale, and, upon defendant's failure to return the notes for judgment against him for $134.00 with 8% interest.

Defendant answered denying warranty of the soundness of the horse and alleged that the defect complained of was pointed out to and observed by plaintiff at the time of the sale and that the sale of the infirm·horse was part of the contract of purchase, plaintiff refusing to sell the sound unless defendant would also buy the unsound horse.

On these issues the case was tried and there was judgment in favor of plaintiff annulling the sale and ordering the two promissory notes given for the purchase price to be returned to plaintiff and in default of this being done within ten days from the date of the judgment that plaintiff recover from defendant $134.00 with legal interest thereon from date of the judgment.

From this judgment defendant appealed.

Plaintiff, Joseph Lachenaye, testified, page 1.

"Q. Did you examine the horses?
"A. Yes, sir.
"Q. At what time of the day was that?
"A. I don't remember exactly, but between nine and ten.
"Q. Did you examine the horses?
"A. Yes. One of them was blind in one eye, and I asked him if the other was good, and he assured me that insofar as the other eye was concerned he would guarantee it.

"Q. Could the horse see in that blind or bad eye?
"A. No, sir, not at all.
"Q. When you examined this horse, did you notice whether or not the other eye was sick?
"A. No, it did not appear sick, but it did look rather yellowish. I asked him if that eye was good, and he said he guaranteed it was good. He guaranteed me that the horse had one good eye and the other bad.

Defendant, Robert P. Bergeron, testified, page 15.

"Q. You are being sued by Joseph Lachenaye to cancel a contract of sale of two horses made last February, on the ground that one of the horses became blind. Tell the court exactly what occurred in this case, starting at the very beginning when he went to see you up to the time of the sale.
"A. At first he wanted to buy only one horse, and I told him I would not sell only one, that I had to sell both, because I would not separate them, for the fact that the big horse had already lost one eye, and he was familiar with the other. A few days before that he had water running out of one eye, and I didn't know that he would not lose the other one. I didn't want to separate the horses, because in the event that one went totally·blind, I could always get some use out of both of them by working them double. He looked at the eyes several times and spoke of my guaranteeing the horse's sight, and I told him that only God could do that. I told him that I was not a horse doctor and that I could not guarantee anything. I told him the horse was liable to go blind at any time and for the further fact that he had already one blind eye and I certainly would not enter into a guarantee on the permanent sight of the other eye."

From this evidence we are convinced that plaintiff knew at the time he bought the horses, that the one he complains of now was then blind in· one eye and had a defect in the other eye.

Plaintiff testified, page 3.

"Q. Did he say he had two horses for sale?
"A. Yes, sir.
"Q. Did you examine the horses then?
"A. Yes. He told me to examine them.

"Q. Did he go with you? A. No sir.

"Q. He told you to pass by his home and see them?

"A. Yes, sir.

"Q. You came back home and did not take the horses?

"A. No, sir.

"Q. How long after that did you go and examine the horses again?

"A. Four or five days later. I went there with my brother and son.

"Q. Did you see Mr. Bergeron then?

"A. Yes.

"Q. Did you examine the horses?

"A. Yes, sir.

"Q. Did you take the horses then and come home with them, the second time?

"A. Yes, after my second examination he guaranteed me the horses and I took them.

"Q. You know something about horses?

"A. Yes, a little.

"Q. You saw that this horse had a bad eye?

"A. Yes, sir.

"Q. You both discussed that?

"A. Yes, sir.

"Q. And he had only one bad eye?

"A. Yes, sir.

"Q. You say the other eye was yellow?

"A. Yes, it appeared yellow to me right in the corner.

"Q. One eye was blind and the other yellow?

"A. It was not yellow all over, no, but was yellow in one corner."

The evidence shows that plaintiff examined the horses on two separate occasions, once when defendant was not present, and that on one of the occasions his son and brother were with him.

We think from all the evidence that plaintiff relied on his own judgment in making the purchase rather than on any representation defendant made to him and that it was the attractive price of $125.00 for the two animals that the evidence shows were worth from $175.00 to $180.00 and a sale all on credit that induced him to buy.

The defect of which plaintiff complains was, we think, such as the buyer might have discovered and in fact did discover before making the purchase and under Civil Code 2521 he cannot now annul the same.

Plaintiff alleged and he and his brother testified that defendant guaranteed the eye of the horse to be well but neither pretends to testify what the condition of the guarantee was. It might have been the forfeiture of the other horse and the return of the promissory notes given as the price of both horses, or it might have been to give a sum of money. But at any rate plaintiff does not allege what defendant guaranteed to do in case the horse's eye went blind, and this case is not based on conditions or terms of the alleged guaranty but is based on the contention that there was at the time of the sale a redhibitory defect in one of the horses and that defendant was in bad faith and knew at the time of the sale that the horse would soon become blind.

The evidence does not, in our opinion, in any way support the contention of plaintiff that defendant was in bad faith.

Alfred Carmouche, a horse doctor, testified, pages 5 and 6.

"Q. Do you know the biggest horse of the two?

"A. Yes, sir.

"Q. How long have you known him?

"A. About a year.

"Q. How come you to know that horse?

"A. He asked me to treat that horse for sore eyes.

"Q. Was it blind in one eye?

"A. Yes, sir.

"Q. Is that the eye that you treated, or was it the other one?

"A. The other one.

"Q. What was the trouble with that eye?

"A. Water was running in the corner of his eye and I treated it.

"Q. How long did you treat that horse?

"A. About a week.

"Q. That was before he sold it to Mr. Lachenaye?

"A. Yes. About a month before.

"Q. Was it in a very bad condition?

"A. Not so very.

"Q. Did you believe that horse was cured forever?

"A. When I took the horse to him his eye was all right, and I told him it was,. and he wanted me to guarantee that it was cured forever. Of course I could not do that, but I had done some harder work on other horses and had saved their sights, but I could not guarantee that this horse was cured forever.

"Q. Was that eye very much affected?

"A. Not so much.

"Q. You say you treated the horse about a month before the sale?

"A. Yes, sir.

"Q. You say the condition of the eye was that it was watery?

"A. Yes, sir.

"Q. How long did you treat that eye?

"A. About a week.

"Q. Did you treat the eye to stop the water?

"A. Yes, sir.

"Q. After you treated the horse for a week you stopped because you thought it was cured?

"A. Yes, sir, it was cured.

"Q. And it did not need any more treatment?

"A. No. I went there to be paid and before paying me he asked me to guarantee the treatment and I told him it was. all right now, but that I could not guarantee it, because no one but God could do that.

"Q. You considered the eye to be in perfect condition when you went for your pay?

"A. Yes, sir.

"Q. You told Mr. Bergeron it was all right?

"A. Yes, sir, it was.

This evidence on the part of plaintiff's witness we, think unquestionably acquits defendant of any bad faith.

In our opinion plaintiff's contention that defendant was in bad faith and knew that the horse would soon be blind is not consistent or reconcilable with his contention that defendant guaranteed the horse's eye to be a good, well eye.

Under all the evidence in the case, we are convinced that plaintiff has failed to discharge the burden of proof resting upon him.

It is therfore ordered, adjudged and decreed that the judgment of the lower court be and the same is hereby reversed and plaintiff's demand rejected and his suit dismissed at his cost.